UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:06-CV-60-F

| | | |
|---|---|---|
| WILLIAM K. LUMSDEN, Personal Representative of the Estate of Jamie Marie Lumsden, deceased; CANDACE MICHELLE LEE; MELANIE L. RITTER; MICHAEL M. CLARK; and WILLIAM B. WILSON,<br>   Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **ORDER** |

After the court denied the Government's Motion to Dismiss by order of May 7, 2008 [DE-25], this case proceeded to discovery which itself was hardly non-adversarial. On December 31, 2009, the plaintiffs filed a Motion for Partial Summary Judgment [DE-54] seeking judgment against the Government on the liability issue, reserving the damages determination for trial. That motion was fully briefed and finally submitted to the undersigned for ruling on March 12, 2010. While the court was drafting an order on the partial summary judgment motion, each party filed notice of newly discovered evidence. The plaintiffs did so by motion [DE-73];[1] the Government's "additional evidence" was revealed by Notice [DE-74] filed on April 27, 2010. Before an order could be entered concerning these "additional evidence" notices, the plaintiffs filed a Second Motion for Leave to Submit Newly Discovered Evidence [DE-75.1] and Motion for Costs or Other Sanctions [DE-75.2]. A relatively large body of "newly discovered" evidence had emerged as a result of the plaintiffs' deposing several key witnesses before trial, which was scheduled for the July 19, 2010, term of court.

---

[1] The court calculated the Government's response, if any, to be due on May 6, 2010, but none was filed by that date.

By order of May 20, 2010, both of plaintiffs' motions for leave to submit [DE-73 and -75.1] were allowed, but the Government's motion to extend until May 25, 2010, the time to respond to both of plaintiffs' motions was denied. *See* [DE-77]. The court indicated that an untimely response might or might not be considered. *See id.* [2]

On May 28, 2010, the Government filed motions to file its Response out of time and for leave to exceed the page limit [DE-78 and -79], accompanied by the text of the proposed Response. The Government did not object to the plaintiffs' filing the "newly discovered" evidence but objected to their interpretation thereof, and to plaintiffs' suggestions that the evidence had deliberately been withheld. On June 2, 2010, the plaintiffs filed a Reply [DE-80] to the Government's Response.

In the interest of creating a full record, the Government's Motion to File Response Out of Time, and to File Excess Pages is ALLOWED, *see* [DE-78 and -79], and the court acknowledges the plaintiffs' Reply thereto. The Clerk of Court is DIRECTED to cause the Government's Proposed Response to be filed.

*Personnel Document Retained by Retired Master Sergeant Burger*

The "newly discovered evidence" that has been produced so recently and so close to trial sheds new light on the factual premises for this lawsuit, painting what appears to be a far more compelling case for the plaintiffs. Details that were omitted from Borges's state criminal trial,[3] or which simply were not included in the trial transcript excerpts filed in this litigation to date, now are emerging that appear to fill gaps in the evidence that the Government earlier had used to its advantage here. For example, in scheduling the deposition of retired Master Sergeant

---

[2] In light of the content of the Second Motion [DE-75.1] and other circumstances of this litigation, the court deemed it inexpedient to hold the pending motions for a response to the Second Motion.

[3] Private Borges was tried and convicted of several crimes in the North Carolina General Court of Justice arising from the events that are the subject of this civil lawsuit.

Charles Burger, the plaintiffs learned for the first time that Burger had retained in his possession more than 260 pages of additional documents related to these events, including handwritten statements by three of Borges's immediate supervisors predating the events giving rise to this lawsuit that leave no question as to their opinion of Borges' character and behavior, his fitness to serve in the armed services, and his shameless commitment to a lifestyle of drug abuse at all costs. One supervisor opined in July 2004, that "the hour he would be able to, [Borges] would commit the same offense" – abusing drugs – that had led to the commencement of administrative discharge proceedings against Borges.

The significance of that opinion is startling in light of the Government's position in opposition to the plaintiffs' Motion for Partial Summary Judgment. Included in the earlier Order denying the defendants' Motion to Dismiss was the court's observation, not intended to be taken literally, that to establish foreseeability on the part of the Government, the plaintiffs would need to show that Government agents knew or had reason to know that Borges would use his "first opportunity" to render himself dangerously intoxicated, *see* Order [DE-25], p. 13. The Government had insisted in its Response to the plaintiff's Motion for Partial Summary Judgment that there was no way the plaintiffs could produce such proof.[4] *See* Response [DE-63], pp. 8-11. As a result of Burger's recent revelations, however, the Government was bound to produce the written statements of its agents and members of Borges's chain of command, that arguably prove exactly that.

In readily admitting that, upon the advice of the Onslow County District Attorney who prosecuted Borges in state court, he had retained in his personal possession military documents that might be relevant in future civil litigation arising from the plaintiffs' injuries, retired Master Sergeant Burger stated that it had been only within the past few months that the

---

[4] Granted, this position was based, at least in part, by the Government's incorrect reading of the record concerning the dates on which certain critical events occurred.

Government had inquired whether he had any such documents. *See* Exhibit C to [DE-75], at pp. 10-11. Additionally, Burger's deposition testimony provides far greater insight into the depth and breath of Borges's drug abuse, the documentation thereof and his chain of command's knowledge of it.

*Staff Sergeant Jeremy Holecheck's Deposition Testimony*

In response to plaintiffs' interrogatories, the Government had stated, "Defendant is aware of a February 12, 2004, incident in which Mr. Borges huffed ether. Mr. Borges was subsequently removed from the Maintenance Battalion and no longer authorized access to the area where ether canisters were maintained. . . . " *See* [DE-55], p. 18 (quoting response to Interrogatory No. 19). The Government adhered zealously to its position that it had done everything possible to prevent Borges from accessing ether and to assist Borges in addressing his drug addiction. Therefore, Staff Sergeant Jeremy Holecheck's April 28, 2010, deposition testimony was especially stunning that during October and November 2004, Borges was one of the members of the Second Maintenance Battalion's HAZMAT team who was *assigned to work inside "the cage" at the battalion issue point where the Government's ether was secured under lock and key. See* Holecheck Depo. Transcript, Exhibit B to [DE- 75], p. 13-14. Holecheck, who, as the HAZMAT Staffing Sergeant C at the Second Maintenance Battalion was Borges's supervisor for that assignment, *see id.* at p. 5, described Borges as, "at basic, you know, a gopher Marine. He was a lance corporal – well, maybe he was a private at – PFC, but I know he was basically a worker bee. . . . What we told him to do, he did." *Id.* at p. 11.

Only selected portions of Holecheck's recent deposition testimony have been provided to the court, but among them are included his confirmation of statements that,

• "And you knew, as of October and November 2004, that the folks in the Battalion HAZMAT did have an obligation to control the ether and access to it"

• "[A]s of October and November 2004, . . . the Marine Corps actually had Borges

4

working inside the cage where the hazardous materials were stored"

- "And ... the ... ether that we talked about that the Marine Corps knew had to be controlled because of its dangers, was ... kept inside that cage [where Borges worked]"

- "[T]he Marine Corps had Borges in a situation in which he routinely had access to that ether"

*Id.* at 10, 14, 27. Holecheck testified that although he supervised the hazardous material room as Borges's supervisor and was within Borges's chain of command, he never had much direct contact with Borges. Holecheck, in fact, denied that "anyone in [Borges's] chain of command, at any time, ever advise[d him] that Mr. Borges had used the ether to make himself intoxicated," or that "anyone ever warn[ed him] that [Borges] might have a tendency to do that." *Id.* at p. 15.

### *Investigator Flores's Deposition Testimony*

Also revealing is CID Investigator Antonio Flores, Jr.'s April 26, 2010, deposition testimony specifically identifying command representative "Gunnery Sergeant Snow" as the Officer of the Day to whom he had made reference five years earlier during his state trial testimony. *See* Flores' Deposition Transcript, Exhibit A to [DE-75], pp. 41-42. At Flores's April 2010, deposition plaintiff's counsel read back to Flores portions of his testimony during Borges's state criminal trial, including the portion in which Investigator Flores testified on voir dire that Borges's vehicle had not been towed to his knowledge, but that " '[Borges] was allowed to pick up his vehicle with the command representative, and the command representative was given the instructions that he did have these canisters in the vehicle.' " *Id.*, quoting Exhibit C to [DE-63], Flores's Voir Dire testimony at p. 246.

Explaining that earlier testimony during his 2010 deposition, Flores stated,

> "I told [the officer of the day] that I had Mr. Borges at the PMO office. I don't know the specific time but some time later, he came to the building to pick up Mr. Borges at which time I let him know what the status of Mr. Borges was as far as why he was even in our custody. Then I went on to let him know where

5

the vehicle was at, why it was there, why it was left there and additional
instructions as far as what the command needs to do in order for that vehicle to
be moved. . . .

\* \* \* \* \*

A command representative had to be with Mr. Borges since I believe his driving
privileges were revoked at the time on base. . . . But additionally, the canisters
had to be removed due to the fact that we believed, myself and the MPs that
were present, believe that one of the canisters possibly had a leak in it – which
was another reason why we left everything where it was at.

Flores Depo. Transcript, Exhibit A to [DE-75], pp. 41-42. Flores confirmed that Gunnery Sergeant Snow would have been within Borges's chain of command. "He was officer of the day, obviously attached to that command." *Id.* at p. 44.

Flores again explained during his 2010 deposition that neither he nor the MP's at the site where Borges was discovered on October 21, 2004, had removed the canisters of ether from the trunk of Borges's car, because they had no place to store them. When asked what he had expected would happen to the canisters in the car, Flores responded,

Well, due to the fact that they're hazardous material and the fact that 2nd
Maintenance Battalion obviously being able – to deal with hazardous material
that they would have taken control of those items and dispose of them properly
or gotten them – gotten into a controlled area. Something that we were unable
to do.

\* \* \* \* \* \*

Like I said, the reason the canisters were left there was due to the fact
that they were hazardous material, clearly marked as hazardous material.
Between myself and the MP's present, we felt as though that was a safety issue
for everyone else present, which is another reason why we told the command
that those canisters were there and that they had to remove those canisters due
to their hazardous material content. It had nothing to do with me knowing at
the time that those canisters were in fact what [Borges] was huffing because he
was not caught in that act.

*Id.* at pp.46-48; *see also* pp. 66-67. The Government suggests that Flores's April 2010 testimony is recently fabricated and inconsistent with his testimony at Borges's state criminal trial.

6

In light of the content of the "new evidence" and the allegations and inferences concerning its failure to have been produced during discovery, the court questions whether additional causes of action and/or theories of liability could and should be advanced by amendment to the Complaint. The implications, not only of the timing and circumstances under which the "new evidence" was revealed but also of the content thereof, are extremely serious. The court deems it imprudent to permit the full record to go undeveloped.

Accordingly, in the interests of justice and fairness to all parties, the court has determined that summary judgment as to the Government's liability is not appropriate. Rather, the court deems it advisable to permit this matter to be tried so as to develop a complete record, and to afford the Government the opportunity it seeks to challenge the credibility of the witnesses. **The court will not address plaintiffs' motion for costs and/or sanctions at this time, but holds that collateral matter in abeyance pending further developments on the merits.**

The Clerk of Court is DIRECTED to schedule and notice a hearing on the status of this litigation before the undersigned on **Friday, June 11, 2010**, at **1:30 p.m.**, or as soon thereafter as the court can reach it.[5] The court will not take evidence at that hearing, but intends to discuss with counsel the timing and mechanics of the upcoming trial, to set briefing deadlines, and schedule additional pre-trial hearings for ruling on objections to witnesses and/or evidence as contained in the parties Pre-Trial Order, the deadline for which also will be addressed.

## SUMMARY

- The Government's Motion to File Response Out of Time, and to File Excess Pages is ALLOWED, see [DE-78];

---

[5] Counsel have been advised that the undersigned has a very heavy term of criminal court beginning on Monday, June 7, 2010, which is expected to last at least two weeks. A number of criminal matters are scheduled for the morning of June 11th.

7

- The Clerk of Court is DIRECTED to cause the Government's proposed Response, attached as Exhibit 1 to [DE-78], to be filed;

- The plaintiffs' Motion for Partial Summary Judgment [DE- 54] is DENIED; all deadlines, including the July 19, 2010, trial date, currently in effect in this case remain in effect pending further order of the court;

- The plaintiffs' Motion for Costs or other Appropriate Sanctions [DE-75.2] is HELD IN ABEYANCE; and

- The Clerk of Court is DIRECTED to schedule and notice a status hearing in before the undersigned in Wilmington, North Carolina, on **Friday, June 11, 2010**, at **1:30 p.m.** or as soon thereafter as the court can reach it.

SO ORDERED.

This, the 3rd day of June, 2010.

*James C. Fox*
JAMES C. FOX
Senior United States District Judge